**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER B. CURTIS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SAFELITE GROUP, INC. and the SAFELITE GROUP, INC. BENEFITS ADMINISTRATOR,<br><br>Defendants. | **Civil Action No.: 2:25-CV-01173-MHW-CMV**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Christopher Curtis, individually and on behalf of the Class defined below of similarly situated persons, allege the following against Safelite Group, Inc. ("Safelite") and the Safelite Benefits Administrator ("Benefits Administrator," collectively with "Safelite," "Defendants") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1. It is both unfair and unlawful for entities like Defendants to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products without complying with the wellness program requirements under the Employee Retirement Income Security Act of 1974 ("ERISA"). This lawsuit challenges Defendants' unlawful practice of charging a "tobacco surcharge" under the Safelite Assoc Ben Plan Insured Plan (the "Plan") in a manner that violates ERISA and the implementing regulations. ERISA permits health-contingent wellness programs if, and only if, such programs strictly comply with the criteria governing these

programs, including: (i) offering a meaningful and accessible reasonable alternative standard to any individual being charged extra based on a health factor; (ii) clearly disclose the availability of that alternative standard in "all plan materials" describing the surcharge; and (iii) provide the "full reward," meaning the entire difference between the tobacco-user and non-tobacco-user contribution levels. *See* 29 U.S.C. § 1182; 42 U.S.C. § 300gg-4(j). Instead, Defendants impose a discriminatory tobacco surcharge without providing participants with a reasonable alternative standard and fail to provide notice of the availability of a reasonable alternative standard, violating federal regulations and depriving employees of benefits to which they are entitled under ERISA.

2. Tobacco surcharges have become more prevalent in recent years but, to be lawful, plans can impose these surcharges only in connection with *compliant* "wellness programs," meaning they must adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, and the Public Service Health Act ("PHSA") § 2705, the statute's non-discrimination provision. Accordingly, the Departments have issued clear regulatory criteria that "must be satisfied" to qualify for the statutory exception or safe-harbor, which employers can invoke only if they affirmatively demonstrate full compliance with all these strict requirements in response to claims that their program is discriminatory. Moreover, courts must defer to the agency's interpretation of its own regulations, if that interpretation is neither plainly erroneous nor inconsistent with the regulatory framework, *Auer v. Robbins*, 519 U.S. 452 (1997), ensuring that plans cannot evade ERISA's anti-discrimination protections by selectively or improperly applying these rules.

3. The strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of these programs being a "subterfuge for discriminating based on a health factor." The regulations make clear that for plans to be compliant, they must provide a clearly defined, reasonable alternative standard that allows all participants to obtain the full reward, including retroactive refunds of surcharges paid while completing the alternative standard. Employers must also notify participants of the alternative standards that are available to them to ensure they are aware of the various pathways to improving their health. A wellness program must not function as a penalty imposed on certain participants under the guise of a health initiative. Defendants' Plan fails to clearly establish a reasonable alternative standard, does not notify employees in key participant-facing materials that such an alternative is available, does not ensure that employees who complete the alternative receive the "full reward," and unlawfully shifts costs onto employees in violation of ERISA's wellness program regulations.

4. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[1] The regulatory

---

[1] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements

5. Outcome-based programs,[2] such as smoking cessation programs, must offer a clearly defined "*reasonable* alternative standard," which is an alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations require that "the *same*, *full reward*" must be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[3] The Department of Labor ("DOL") has made clear that participants should not be forced to rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as provided to non-smokers. *Id.* The Departments made this requirement clear when they stated it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual participating in the program*** should be able to receive ***the full***

[2] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

[3] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**") ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

***amount of any reward or incentive*** . . . ." *Id.*, 33160 (emphasis added). Defendants violate these requirements by failing to provide a reasonable alternative standard that provides the "full reward" to employees who complete that standard, by operating a non-compliant penalty structure rather than a lawful wellness incentive, and by failing to clearly communicate the availability of a reasonable alternative standard in all plan materials referencing tobacco-related premium differentials, including plan documents and summary plan descriptions ("SPDs"). *Id.* These failures constitute direct violations of ERISA's wellness program regulations.

6. Defendants cannot qualify for the statutory safe harbor permitting discriminatory surcharges because the Plan fails to satisfy all the regulatory criteria, which "must be satisfied," (*id.*, 33160) for a wellness program to be lawful under ERISA. Final Regulations, 33160. Defendants' wellness program does not offer a reasonable alternative standard that provides the "full reward" to all participants who satisfy the alternative standard, as explicitly required by ERISA § 702 of ERISA, 29 U.S.C. § 1182, 42 U.S.C. § 300gg-4(j)(3)(D), and 29 C.F.R. § 2590.702(f)(4) and 45 C.F.R. § 146.121(f)(4). The Plan fails to offer or notify participants of a clearly defined, reasonable alternative standard that ensures employees who satisfy that standard receive a full refund of the additional amounts they paid for being a tobacco user. Instead, Safelite retains these ill-gotten funds in its own accounts, earns interest on them, and contributes less to the Plan. By failing to administer its surcharge program in compliance with ERISA's wellness regulations, Defendants cannot claim the protections of ERISA's safe harbor and are liable for their unlawful surcharge scheme.

7. By failing to make available an alternative standard or a mechanism for retroactive reimbursement to those who satisfy that standard, Defendants operate an unlawful surcharge program that denies employees who smoke the opportunity to avoid the penalty, as required by

law. This is not a minor technical failure; it is a fundamental violation of the regulation's core purpose: ensuring that participants have an opportunity to avoid the smoking surcharge and receive the same financial benefit as those who meet the initial standard (i.e., non-smokers).

8. Further, Defendants failed to provide notice. Defendants failed to include a description of the terms of an alternative standard and failed to include contact information for obtaining the alternative standard in key participant-facing materials. Upon information and belief, Defendants failed to include reference to a wellness program in *all* plan materials discussing the surcharge, despite the Departments' clear instructions that, for ERISA plans, wellness programs are required to be disclosed in these documents if compliance affects premiums. Final Regulations, 33166 ("a plan disclosure that references premium differential based on tobacco use . . . must include this disclosure"). This standalone violation disqualifies Defendants from asserting the affirmative defense in response to the allegations herein that their tobacco surcharge program is discriminatory and violates ERISA. Again, because Defendants' tobacco surcharge does not satisfy the necessary regulatory criteria for a "program[] of health promotion," Defendants cannot qualify under the statutory safe harbor, meaning the tobacco surcharge they impose on participants is discriminatory in violation of ERISA.

9. This Amended Complaint alleges that Defendants impose a discriminatory and unlawful tobacco surcharge. Defendants bear the burden of proving that their tobacco surcharge is nondiscriminatory by showing they make available a wellness program that fully complies with every regulatory requirement under ERISA and its implementing regulations, including providing a clearly defined, reasonable alternative standard that allows all participants to avoid the surcharge and receive a full refund if they satisfy the alternative. Defendants cannot meet this burden because the Plan does not offer any alternative standard at all. Without a reasonable alternative standard,

Defendants' surcharge is not a lawful wellness incentive, but an impermissible penalty imposed on employees based on a health factor. Even if an alternative standard does exist, Defendants fail to provide clear notice of its availability in key plan materials, including the SPD and benefit guides, which is a standalone violation. Their failure to offer and communicate a reasonable alternative standard, year after year, makes their surcharge program facially unlawful under ERISA, and no amount of *post hoc* justifications can cure this fundamental defect. The Plan does not offer a "program[] of health promotion or disease prevention," as required by ERISA, but instead imposes an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

10. Notably, the Plan itself expressly states that "a group health plan … shall comply with the applicable group market (insurance) reforms under PPACA," and then lists PHSA § 2705 — "prohibiting discrimination against participants and beneficiaries based on a health factor" — as an obligation of the Plan. Therefore, once the Plan sponsor obligated itself to nondiscrimination, Defendants' decision to impose and administer a discriminatory tobacco surcharge violated not only federal law but the Plan itself. ERISA requires fiduciaries to administer the Plan in compliance with ERISA but also according to its written terms. Defendants, here, did neither.

11. Plaintiff is a current employee of Safelite who paid the unlawful tobacco surcharges to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiff and continues to impose such a burden on those similarly situated.

12. Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent Defendants from continuing to profit from their violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendants are fiduciaries of the Plan who have a legal

obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of himself and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

## PARTIES

13. Plaintiff Christopher Curtis is, and at all times mentioned herein was, an individual citizen of the State of Arizona residing in the County of Maricopa. Plaintiff was an employee of Safelite who paid a tobacco surcharge, upon information and belief, of roughly $25 – $35 per paycheck in connection with the health insurance offered through Safelite during his employment. Plaintiff was required to pay this tobacco surcharge to maintain health insurance under the Plan.

14. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

15. Safelite is a leading provider of vehicle glass repair, replacement, and claims management services. Headquartered in Columbus, Ohio, Safelite operates across all 50 states, serves millions of customers, and specializes in mobile and in-shop auto glass services as well as wholesale distribution of auto glass products.

16. Safelite is the sponsor of the Plan under 29 U.S.C. § 1002(16). Safelite employs thousands of individuals and there are over 15,000 participants in the Plan as of December 31, 2023. The Plan is an employee benefit plan is subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3).

17. The Safelite Benefits Administrator ("SBA") is the Plan Administrator under § 1002(16) and is a named fiduciary under the Plan. Upon information and belief, The SBA is responsible for the overall administration and operation of the Plan, including oversight of plan

communications, compliance with ERISA's disclosure requirements, and ensuring that surcharges and wellness programs are administered in accordance with the law

## JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1) and § 28 U.S.C. 1331, as this suit seeks relief under ERISA, a federal statute. It also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 1,000, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19. This Court has personal jurisdiction over Defendants because Safelite is headquartered in this District, and Defendants have purposefully availed themselves of the privilege of conducting business in Ohio.

20. Venue is proper in this District under 2 U.S.C. 1132§ (e)(2) because Safelite is headquartered in this District and this is a District in which Defendants may be found.

## FACTUAL BACKGROUND

### I. DEFENDANT'S TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements

21. To expand access to affordable health insurance coverage, the Affordable Care Act ("ACA") amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the

plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1).

22. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B)(emphasis added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

23. Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

24. Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the Affordable Care Act ("ACA") and Public Health Service Act ("PHSA") in 2010, the Departments, published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory

wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

25. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge, the burden is on the employer to prove that it complied with *all* the necessary regulatory criteria and that the surcharge is non-discriminatory.

26. Compliance with the regulatory criteria is not optional. These criteria serve as the standard by which these wellness programs can be evaluated and are the only lawful pathway for plans to impose health-based premium differentials without violating ERISA's anti-discrimination provisions. *See* Final Regulations, 33160 ("***these [F]inal [R]egulations set forth criteria for a program of health promotion or disease prevention*** . . . that ***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination . . . .") (emphases added).

27. In satisfying each of the criteria, plans can ensure that wellness programs are "not a subterfuge for underwriting or reducing benefits based on health status." *Id.* They prevent employers from using surcharges as a revenue-generating mechanism dressed up as a program of health promotion. If a program fails to meet even one of these requirements, the program does not qualify as a "program[] of health promotion" and cannot qualify under ERISA's statutory carve-

out. In that case, any premium differentials imposed based on a health factor violate the statute's anti-discrimination provisions. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if all of the [] requirements are satisfied***.").[4] In sum, a wellness program that fails to satisfy each criterion is not a legitimate health promotion initiative but an unlawful penalty that discriminates based on health status, in direct violation of ERISA's protections.

**B. Regulatory Criteria**

28. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii)

---

[4] Congress codified parts of the 2006 regulations regulatory criteria when, through the Patient Protection Act ("PPA") and ACA, it amended the PHSA, and incorporated (nearly verbatim) the regulatory language into ERISA. *See* 42 U.S.C. § 300gg-4(j)(3); 29 U.S.C. § 1185d(a)(1) ("[T]he provisions of part A of title XXVII of the [PHSA] [42 U.S.C. § 300gg *et seq*.] (as amended by the [PPA and ACA]) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart[.]"). Since then, the Departments have, in accordance with the they were granted, updated the regulatory framework through the Final Regulations, refining and clarifying the requirements to ensure compliance with ERISA's nondiscrimination provisions and the statutory criteria established by Congress. *See* 42 U.S.C. § 300gg-4(n) ("Nothing in this section shall be construed as prohibiting the Secretaries of Labor, Health and Human Services, or the Treasury from promulgating regulations in connection with this section"); *see also* 45 C.F.R. § 146.121(f) (adopting identical language to § 2590.702(f)).

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)).

(d) Uniform availability and reasonable alternative standards: "The ***full reward*** under the outcome-based wellness program must be available to ***all similarly situated individuals***." 29 C.F.R. § 2590.702(f)(4)(iv).

(e) Notice Requirement: "The plan must disclose in all plan materials describing the terms of the program ***the availability of other means of qualifying for the [full] reward***." Final Regulations, 33159 (emphasis added).

29. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

30. Regarding the first criteria, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

31. A key requirement of the fourth criterion for outcome-based programs is that the "full reward" must be available to "all similarly situated individuals[,]" regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165. Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual*** participating in the program should be able to receive the ***full amount of any reward or incentive***. . . ." *Id.* (emphases added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is ***mandatory***, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

32. The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in or participation in a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id.* The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . . and the program fails to satisfy the requirements of paragraph (f) of this section." *Id.*; Final Regulations, 33180.

33. For health contingent wellness programs, the Final Regulations require the notice be disclosed "in ***all*** plan materials describing the terms of" the program. 29 C.F.R. § 2590.702(f)(3) and (4) (emphasis added); *see also* 42 U.S.C. § 300gg-4(j)(3)(E). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Here, Defendants' SPD contains no disclosure of the surcharge or any alternative standard, and other Plan materials, like benefit guides, likewise omit any reference to the surcharge, preventing participants from knowing about their rights to avoid the surcharge.

34. Defendants' tobacco surcharge is unlawful because it fails to comply with the Final Regulations governing tobacco surcharges. As discussed, the Final Regulations provide that outcome-based wellness programs, such as those involving tobacco cessation programs, are permissible under ERISA ***only if all regulatory requirements are satisfied***. *See* 29 C.F.R. § 2590.702(f)(4).

35. The Final Regulations provide clear examples of compliant and non-compliant tobacco surcharge programs. In Example 6, the group health plan imposes a tobacco use surcharge as part of its wellness program, but it remains compliant with ERISA regulations because it offers a reasonable alternative standard in the form of a smoking cessation program. Final Regulations, 33180. The hypothetical plan imposes a premium surcharge on tobacco users, which is determined annually based on a health risk assessment (i.e., participants self-identify as smokers). To avoid the surcharge, participants who use tobacco are not required to stop smoking entirely; instead, they can participate in a smoking cessation program offered by the plan. *Id.* The smoking cessation

program is a "reasonable alternative standard" because it gives participants another way to avoid the surcharge, even if they are unable to quit smoking. *Id.*

36. The plan facilitates participation in the alternative standard by ensuring the program is not unreasonably burdensome and is cost-free to participants. *Id.* Participants can avoid the surcharge simply by completing the smoking cessation program—they are not penalized for failing to quit smoking. *Id.* The hypothetical plan in Example 6 also meets the strict notice requirements under ERISA regulations because it clearly informs participants (a) about the availability of the alternative standard (i.e., the smoking cessation program), (b) how to access the program, including providing contact information, and (c) that the plan will accommodate recommendations from the participant's personal physician if the cessation program needs to be adjusted for medical reasons. *Id.*

37. Further, the example provides that participants can qualify for the reward (or avoid the surcharge) at least once per year. *Id.* The tobacco surcharge described in Example 6 of the Final Regulations is permissible under ERISA because the program is reasonably designed to promote health by offering tobacco users a legitimate alternative path to avoid the surcharge. The plan ensures the alternative standard is reasonable by providing access to the "full reward" for "all similarly situated individuals" and does not impose unnecessary burdens on participants. Further, the plan fully complies with the notice requirements by clearly disclosing the smoking cessation program, contact information, and the option for physician accommodations. The Final Regulations conclude that the premium differential is not discriminatory because the employer satisfies all the regulatory requirements under 29 C.F.R. § 2590.702(f)(4)(i), (iii), (iv), and (v) and avoids being classified as a discriminatory wellness program.

38. Unlike Example 6 of the Final Regulations, Defendants do not provide participants with any reasonable alternative standard to avoid the tobacco surcharge they impose on participants. There is no smoking cessation program, waiver, or alternative route for tobacco users to obtain the "full reward" (i.e., avoiding the surcharge). The only avenue for smokers to avoid the surcharge would be to quit smoking and inform the benefits department of that change in status. Thus, tobacco users are penalized based solely on their status as smokers, which violates ERISA's non-discrimination provisions.

39. Defendants should have implemented a reasonable alternative standard in the form of a smoking cessation program that allowed users to avoid the surcharge for the entire plan year, regardless of whether they quit using tobacco. Defendants should have offered the program at no cost to participants and ensured that it was accessible and not overly burdensome by, for example, providing for convenient times and locations. Defendants should have ensured that the program provided those who completed it with the "full reward" through reimbursements or pro rata adjustments to insurance premiums. Defendants should have reviewed the terms of their surcharge program to ensure it complied with federal law.

40. Additionally, Defendants should have included clear and specific notice of the availability of the reasonable alternative standard in all Plan materials discussing the surcharge. That notice should have stated that an alternative standard (or waiver) was available, and Defendants should have reviewed the communications provided to participants to ensure those communications complied with federal law. Defendants should have provided contact information for obtaining the alternative standard and should have included a statement that the Plan would accommodate the recommendations of the participant's personal physician regarding the medical appropriateness of the alternative standard.

41. Defendants' Plan materials, including the SPD and annual benefits guides, fail entirely to mention the availability of a reasonable alternative standard. Without this disclosure, participants are unaware of their rights under ERISA and cannot access alternative means to avoid the surcharge.

42. By failing to meet the regulatory requirements, Defendants' tobacco surcharge is discriminatory, and in clear violation of ERISA and its implementing regulations.

43. Allowing companies like Safelite to exploit its employees and unlawfully extract millions from them under the guise of a wellness program that is, in reality, a cash grab, directly contradicts ERISA's purpose of protecting workers from health-based discrimination. If unchecked, this practice would permit fiduciaries to unjustly shift the financial burdens onto employees, and penalizing compliant employers for spending the time and money to ensure their programs complied with ERISA and the Final Regulations.

## II. DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

44. Defendants' tobacco surcharge violates ERISA because they offer no "program[] of health promotion or disease prevention." 29 U.S.C. § 1182(b)(2)(B). To qualify for ERISA's safe harbor under § 1182(b)(2)(B) that allows a plan to charge a discriminatory fee, the employer ***must*** offer a wellness program with a clearly defined, reasonable alternative standard that provides all participants who satisfy that standard to receive the full reward, and must notify participants of the various avenues available to avoid the surcharge. Defendants fail to meet these requirements because there is no wellness program, and, even if there is, Defendants do not meaningfully inform participants of that wellness program.

45. Specifically, Defendants impose a surcharge of, upon information and belief, $25 – $30 per paycheck based solely on a participant's nicotine use. Failing to make available a

wellness program means Defendants fail to satisfy at least four of the five criteria for a compliant wellness program. *See* Final Regulations, 33163 ("the final regulations direct that an outcome-based wellness program ***must provide a reasonable alternative standard*** to qualify for the reward, for all individuals who do not meet the initial standard that is related to a health factor, in order to be reasonably designed").

46. Defendants fail to give participants at least one opportunity per year to qualify for the reward, in violation of § 300gg-4(j)(3)(C), fail to make available the full reward, in violation of § 300gg-4(j)(3)(D), and fail to disclosure the availability of a reasonable alternative, in violation of § 300gg-4(j)(3)(E). By failing to offer or mention a wellness program, Defendants not only violate the statute but also the Final Regulations, which most district courts around the country have recently found to be enforceable.[5] These deficiencies make Defendants' tobacco surcharge an impermissible cost-shifting scheme rather than a compliant health promotion program.

47. During the course of his employment with Safelite, Plaintiff paid this unlawful surcharge. Upon information and belief, the company's enrollment materials provided to him did not mention an avenue to avoid the tobacco surcharge. Further, upon information and belief, if Plaintiff had quit smoking the surcharge would be removed only on a go-forward basis.

---

[5] *See Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882 (E.D. Va. 2025); *Mehlberg v. Compass Grp. USA, Inc.*, No. 24-cv-04179, 2025 U.S. Dist. LEXIS 84589 (W.D. Mo. Apr. 15, 2025); *Lipari-Williams v. Mo. Gaming Co.*, 339 F.R.D. 515 (W.D. Mo. 2021); *Sec'y of Labor v. Macy's, Inc.*, No. 1:17-cv-541, 2021 U.S. Dist. LEXIS 221603 (S.D. Ohio Nov. 17, 2021); *Fisher v. GardaWorld Cash Serv. Inc.*, No. 3:24-cv-00837, 2025 U.S. Dist. LEXIS 167251 (W.D.N.C. Aug. 27, 2025); *Buescher v. N. Am. Lighting, Inc.*, No. 24-cv-2076, 2025 U.S. Dist. LEXIS 135992 (C.D. Ill. June 30, 2025); *Waggoner v. Carle Found.*, No. 24-cv-2217, ECF 27 (C.D. Ill. Sept. 16, 2025); and *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 2:24-cv-02749, 2025 U.S. Dist. LEXIS 190335 (W.D. Tenn. Sep. 26, 2025).

48. ERISA's safe harbor protection applies only if every regulatory criterion is satisfied. Defendants' numerous violations of the regulatory framework render it ineligible for safe harbor protection. *See* 29 C.F.R. § 2590.702(f)(4).

## III. DEFENDANTS' SURCHARGE IS A BREACH OF THE PLAN'S NONDISCRIMINATION RULE

49. Article XI of the Safelite Health and Welfare Benefit Plan expressly provides that each "group health plan … shall comply with the applicable group market (insurance) reforms that apply to a group health plan under the … PPACA." The provision specifically lists PHSA § 2705, which prohibits discrimination against participants and beneficiaries based on a health factor, as one of the binding mandates on the Plan.

50. By referencing and incorporating § 2705 and its implementing regulations (29 C.F.R. § 2590.702), the Plan contractually obligates itself to administer coverage in compliance with those nondiscrimination requirements. This commitment to nondiscrimination is part of the governing Plan document that dictates the fiduciaries' duties and the participants' rights. The Plan therefore commits, as a matter of plan governance, to operate in accordance with those provisions. Because the Plan expressly adopts § 2705 and 29 C.F.R. § 2590.702 as binding obligations, any violation of those nondiscrimination rules is also a violation of the Plan itself. By imposing a tobacco surcharge without a compliant wellness program and by failing to provide participants with a reasonable alternative standard, Defendants not only contravened federal law but breached the written terms of the Plan. In other words, Defendants violated the Plan by violating the law the Plan incorporates.

## IV. DEFENDANTS' SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

51. Defendants administer the tobacco surcharge by designating which participants are charged and withholding the surcharge directly from participants' paychecks as a before-tax plan contribution, alongside required premium deductions. These deductions are part of the funding stream for Plan coverage, not separate penalties, and are treated the same way as other contributions made to support the Plan's medical benefits.

52. The governing Plan is funded by both employer and participant contributions. Defendants commit a defined company contribution amount toward the cost of coverage, with participants paying the balance. By layering a tobacco surcharge on top of those required participant contributions, Defendants created what should have been a third stream of funding available to the Plan: (1) participants' required premium contributions, (2) Safelite's promised company contribution amount, and (3) the additional tobacco surcharge. But instead of allowing all three funding streams to flow into the Plan, Defendants used the tobacco surcharge to offset Safelite's funding obligation. Because the cost of coverage for each tier is fixed, every dollar of surcharge collected reduced Safelite's company contribution dollar-for-dollar. Thus, rather than increasing resources available to the Plan, the surcharge simply shifted costs away from Safelite and onto participants. When Defendants took these deductions in the same manner as other premium contributions, they comingled the funds and used them to offset their own contributions to the Plan.

53. This practice constitutes classic self-dealing because Defendants manipulated the Plan's funding structure to realize savings for Safelite, depriving the Plan of the full benefit of the three distinct funding streams it should have received. Defendants' actions caused the Plan to lose the very employer contributions it was otherwise obligated to make, in violation of ERISA's fiduciary duty standards.

54. In doing so, Defendants failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to offset the premiums of non-smokers, Defendants used the funds to save Safelite money. The money that Safelite did not have to contribute to the Plan sat in its accounts and earned interest, while the Plan was deprived of the full amount of funding it should have received, stripping the Plan of employer dollars it was owed and converting those savings into financial benefit for Safelite. This diversion of funds is self-dealing, violates the duty of loyalty, and constitutes a prohibited transaction under ERISA §§ 404 and 406.

55. Further, by violating the Plan's incorporated nondiscrimination mandate, Defendants not only discriminated against participants based on a health factor but also used that unlawful practice as a funding device that enriched the employer at the Plan's expense. In administering the surcharge in a manner contrary to the Plan's own terms and federal law, Defendants acted in bad faith toward participants, diverted Plan assets for the employer's benefit, and breached their fiduciary duties of loyalty and prudence. This discriminatory surcharge was an abuse of Plan administration that turned a supposed "wellness" initiative into an avenue for corporate savings.

## CLASS DEFINITION AND ALLEGATIONS

56. Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

57. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**Tobacco Surcharge Class**

> All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendants.

58. Excluded from the Class are Safelite's officers, directors, judicial officers and their immediate family members, and associated court staff assigned to this case.

59. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

60. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1).

61. **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains hundreds of participants who have been damaged by Defendants' conduct as alleged herein, the identity of whom is within the knowledge of Defendants and can be easily determined through Defendants' records.

62. **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

a. Whether Defendants' tobacco surcharge discriminates against participants based on a health status related factor;

b. Whether Defendants offer an opportunity to satisfy an alternative standard at least once during each Plan year;

c. Whether Defendants offer a reasonable alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;

d. Whether Defendants provide the proper notices of an alternative standard in all the plan materials describing the surcharge;

e. Whether Defendants' tobacco surcharge program violates ERISA;

f. Whether Defendants breached their fiduciary duties by collecting and retaining the unlawful tobacco surcharge;

g. Whether Defendants breached their fiduciary duties by using the ill-gotten surcharge funds to offset Safelite's contributions to the Plan;

h. Whether Defendants breached their fiduciary duties by violating the Plan's nondiscrimination mandate;

i. Whether Safelite breached its fiduciary duty to oversee and monitor the decisions and actions of the SAB in connection with the tobacco surcharge;

j. Whether Defendants breached their fiduciary duties by failing to periodically review the terms of the surcharge program to ensure compliance with ERISA and applicable regulations;

k. The appropriate mechanisms to determine damages on a class-wide basis

63. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharges. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

64. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendants and were harmed by Defendants' misconduct in that he was assessed unfair and discriminatory tobacco surcharges. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

65. **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would be virtually impossible for a

member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her. Further, even if the Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

66. Plaintiff seeks injunctive, declaratory, and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide injunctions are issued, Defendants may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE A REASONABLE ALTERNATIVE STANDARD
### (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv); 45 C.F.R. § 146.121(f)(4)(iv))

67. Plaintiff re-alleges and incorporates herein by reference allegations 1–71 of this Complaint.

68. Defendants unlawfully impose a tobacco surcharge on all participants who use tobacco in violation of ERISA § 702. By deducting roughly $10 weekly based on a health factor without offering a reasonable alternative standard that guarantees "the same, full reward" as required by 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121(f)(4)(iv), Defendants impose a

discriminatory premium differential prohibited by ERISA § 702(b), 29 U.S.C. § 1182(b)(1). This discrimination stems from Defendants' decision not to make available an alternative standard that ensures that those who satisfy that alternative standard are provided with the full reward.

69. ERISA explicitly prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor." *See* 29 U.S.C. § 1182(b). Defendants' Plan violates this prohibition by failing to make available an alternative standard that provides those who satisfy it with the "full reward." Because the Plan provides no compliant mechanism through which either employees can satisfy a reasonable alternative standard and obtain the full reward, Defendants cannot qualify for the statutory safe harbor under 29 U.S.C. § 1182(b)(2)(B).

70. Defendants' imposition of the tobacco surcharge violates ERISA § 702, PHSA § 2705, and the Final Regulations, including but not limited to 45 C.F.R. § 146.121(f)(4) and 29 C.F.R. § 2590.702(f)(4). The Plan's wellness program is noncompliant because it fails to satisfy the full reward requirement for all similarly situated individuals: employees have no avenue to obtain the full reward upon completing any alternative standard mid-year. Participants must be provided with an avenue for them to avoid the surcharges imposed on them.

71. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: (A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan. *See* 29 U.S.C. § 1182(b). Because Defendants' surcharge program does not satisfy the full reward rule that plans must comply with to qualify as a compliant "program[] of health promotion and disease prevention,"

Defendants cannot qualify for the statutory safe-harbor and the tobacco surcharge is, therefore, unlawful and discriminatory. Plaintiff and Class Members are entitled to relief under ERISA § 502(a)(3).

72. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress Defendants' violations of ERISA's anti-discrimination provisions outlined in § 1182(b) and § 300gg-4, including but not limited to injunctive relief, restitution, and any other relief necessary to remedy Defendants' unlawful conduct, as set forth in the Prayer for Relief.

## COUNT II
## UNLAWFUL SURCHARGE – FAILURE TO PROVIDE REQUIRED NOTICE
## (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v))

73. Plaintiff re-alleges and incorporates herein by reference allegations 1–71 of this Complaint.

74. ERISA requires that plans imposing a health-contingent premium differential must disclose "in all plan materials describing the terms of the wellness program" the availability of a reasonable alternative standard that allows individuals to avoid the surcharge. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v). This mandatory disclosure must be clear, conspicuous, and included in every document that discusses the surcharge. Defendants fail to satisfy this requirement.

75. Defendants' Plan materials, including the Guides, SPDs, and governing Plan documents, do not contain a compliant notice identifying a *reasonable* alternative standard that informs participants they will be made whole, describing how to access or complete the alternative standard, or providing contact information. The notice that is provided is deficient because it fails

to explain that completion of any standard removes the surcharge and does not identify the cessation program as the reasonable alternative standard required under ERISA. Further, it provides no clear contact information for accessing the alternative standard. Upon information and belief, there are other participant-facing communications describing the tobacco surcharge that fail to properly notify participants of the alternative standard and all avenues to avoid the surcharge.

76. The SPD contains no mention whatsoever of the tobacco surcharge or any reasonable alternative standard, despite the Final Regulations' explicit requirement that all wellness program terms affecting premiums must be disclosed in the SPD. Final Regulations, 33166 ("For ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents (which must be provided upon request), if compliance with the wellness program affects premiums, cost sharing, or other benefits under the terms of the plan."). Defendants' SPD omits any reference to the surcharge, any alternative standard or any avenue to avoid the surcharge, rendering it noncompliant on its face.

77. Because participants are provided no notice of a compliant alternative standard, nor any avenue to avoid or reverse the surcharge, the surcharge is per se unlawful under 42 U.S.C. § 300gg-4(j)(3)(E).

78. Defendants' failure to include compliant notice in "all plan materials" describing the surcharge, as expressly required by statute and regulation, precludes them from invoking the wellness-program safe harbor. Every year of the class period and prior, Defendants issued participant-facing Plan communications that described the surcharge but omitted the mandatory alternative standard disclosure.

79. As a result of these notice failures, participants and dependents were unaware that the surcharge could be avoided or challenged, and many paid surcharges they would not have incurred had Defendants provided the required information. These violations render Defendants' tobacco surcharge unlawful and discriminatory under ERISA.

80. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks injunctive and other equitable relief to redress Defendants' violations of ERISA's notice requirements, including an injunction prohibiting enforcement of the surcharge absent compliant notice, reformation of the Plan to include the required disclosures, and restitution or surcharge of amounts improperly collected from participants.

## COUNT III
## BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF)
## (Violation of ERISA §§ 404, 406, and 409 29 U.S.C. §§ 1104, 1106, and 1109)

81. Plaintiff re-alleges and incorporates herein by reference allegations 1–71 of this Complaint.

82. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

83. Instead of loyally and prudently acting in the best interests of Plan participants, Defendants chose to use Plan assets to benefit Safelite, to the detriment of the Plan and its

participants, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks and using these funds to offset Safelite's own obligations to contribute to the Plan. Paystubs confirm that these surcharges were collected as before-tax deductions, alongside other plan contributions, and thus were Plan assets from the moment of collection. Defendants breached their fiduciary duty by assessing and collecting the tobacco surcharge in violation of federal law and in violation of the terms of the Plan and then diverting those funds to reduce Safelite's own costs. The Plan should have received three funding streams: (1) employee premium contributions, (2) Safelite's contribution amount, and (3) the surcharge itself. But Defendants used the surcharge to displace Safelite's own contributions. Upon information and belief, Safelite further profited by retaining those amounts in its own accounts, earning interest, and failing to remit the full employer contribution owed to the Plan.

84. Year after year, Defendants administered the Plan within the meaning of 29 U.S.C. § 1002(16) and were fiduciaries within the meaning of 29 U.S.C. § 1002(21), in that they exercised discretionary authority and discretionary control respecting the management and administration of the Plan and its surcharge programs, including the decision not to offer a reasonable alternative standard. Defendants exercised discretionary authority by deciding how surcharge proceeds were handled, funneling the surcharge funds indirectly into Safelite's coffers. The SAB also controlled whether participants would receive the "full reward" of avoiding the surcharge for the Plan year and failed to administer notices or alternatives required by ERISA's implementing regulations.

85. The SAB controlled the content of and disseminated to all employees the benefit guides and other Plan communications but failed to notify participants of a reasonable alternative standard by which they could avoid the entire year of surcharges. The SAB further failed to conduct periodic or prudent reviews of its Plan and the related communications to ensure

compliance with ERISA and its regulations. Instead, the SAB allowed a structurally defective surcharge to persist year after year, even though it resulted in discriminatory surcharges, violated the terms of the Plan, and deprived the Plan of the employer contributions it should have received.

86. The SAB breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements and by violating the terms of the Plan itself through a discriminatory surcharge. It acted disloyally by using ill-gotten funds to shrink Safelite's own financial contributions. It also failed to properly notify participants, year after year, of a compliant wellness program and failed to review the terms of the Plan to ensure compliance. These breaches are incompatible with ERISA's core fiduciary mandates.

87. ERISA also imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the SAB to impose an unlawful tobacco surcharge in connection with a noncompliant wellness program in violation of ERISA, Safelite breached its fiduciary duties to supervise and monitor the SAB. Safelite also failed to monitor the frequency with which the SAB reviewed the terms of the wellness program to ensure compliance with ERISA.

88. As a result of the unlawful surcharges, Safelite enriched itself at the expense of the Plan. By deducting these amounts directly from participants' paychecks without properly administering a compliant wellness program, Safelite secured financial savings for itself while participants and the Plan bore increased costs. The structure of the program ensured that "all similarly situated individuals" could not obtain the "full reward" for the entire plan year, and Defendants' communications failed to disclose participants' rights to a reasonable alternative standard. In this way, Defendants transformed what should have been an employer-funded plan contribution into an unjust enrichment for itself, contrary to 29 U.S.C. § 1104(a)(1)(A).

89. Further, by withholding unlawful tobacco surcharges from participants' paychecks and using those funds to reduce its own financial obligations to the Plan, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party in interest—namely, Safelite —in violation of 29 U.S.C. § 1106(a)(1). Safelite is a party in interest, as defined under 29 U.S.C. § 1002(14), because it is both the Plan sponsor and a fiduciary exercising discretionary authority over the SAB.

90. By retaining the amounts of the tobacco surcharges, Safelite increased its own corporate assets and saved the money it would otherwise have had to contribute to the Plan. In doing so, it dealt with Plan assets for its own benefit, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from engaging in self-dealing. The surcharges should have supplemented, not displaced, Safelite's contributions. By retaining and misusing them, Safelite benefitted from the surcharge program at the expense of participants, leaving the Plan underfunded compared to what it should have received under its governing documents.

91. Defendant breached its fiduciary duties by: failing to properly disclose material information about the wellness programs to participants, thereby depriving them of the ability to make informed choices; administering a wellness program that violated ERISA's anti-discrimination provisions; acting on behalf of a party whose interests were adverse to the Plan and its participants, in violation of ERISA § 406(b)(2); and failing to prudently review the Plan and surcharge program to ensure compliance with ERISA's requirements. These breaches caused Plaintiff and the Class to incur unlawful surcharges that shifted costs to participants and away from Safelite. Had Defendants complied with their fiduciary duties, they would have offered a reasonable alternative standard each plan year, ensured that surcharge proceeds were deposited

into the Plan as additional funding while continuing to make the agreed-on contributions, and safeguarded participants from bearing unlawful costs.

92. Defendants also breached their fiduciary duties by failing to administer the Plan in accordance with its own governing documents, as required by ERISA § 404(a)(1)(D). Article XI of the Plan expressly incorporates the nondiscrimination mandates of PHSA § 2705 and 45 C.F.R. § 146.121(f)(4). By imposing a tobacco surcharge without a compliant wellness program and without providing a reasonable alternative standard, Defendants disregarded these incorporated obligations and violated the Plan's written terms. This failure to adhere to the Plan documents is itself a breach of fiduciary duty under ERISA, independent of the underlying self-dealing violations.

93. As a direct and proximate result of these fiduciary breaches, Plaintiff and members of the Class collectively lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks.

94. Plaintiff is authorized to bring this action on a representative basis on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Pursuant to 29 U.S.C. § 1109, Defendants are liable to: make good to the Plan all losses resulting from its breaches, including but not limited to any and all equitable and remedial relief as is proper, disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan or a constructive trust all profits acquired through its violations, as alleged herein.

## COUNT IV
## BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)
## (Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)

95. Plaintiff re-alleges and incorporates by reference allegations 1–71 of this Complaint.

96. At all relevant times, Defendants were the administrators of the Plan and acted as fiduciaries because they exercised discretionary authority and control over the administration of the Plan, the imposition and handling of tobacco surcharges, and the content of the communications provided to participants and their dependents.

97. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

98. Defendants breached these duties by administering a surcharge program that violated ERISA's nondiscrimination requirements, by failing to make available or operate a compliant reasonable alternative standard for employees or dependents, and by structuring the tobacco surcharge in a manner that shifted costs to participants while reducing Safelite's own financial obligations to the Plan. Defendants exercised discretionary authority over how surcharge proceeds were handled, whether individuals would ever receive the full reward, and what information was communicated to participants about their rights under the Plan.

99. Upon information and belief, the SAB drafted, approved, and disseminated the benefit guides, SPDs, and other materials that describe the tobacco surcharge. These materials omitted the mandatory disclosures required by ERISA's wellness-program regulations, including the terms of the reasonable alternative standard and contact information to access that standard. Defendants failed to include any reference to the surcharge or any alternative standard in the SPD,

despite explicit direction in the Final Regulations that wellness program terms affecting premiums must be disclosed in the SPD. Defendants also failed to conduct prudent or periodic reviews of the surcharge program or its communications to ensure compliance with ERISA. Instead, Defendants administered a structurally defective surcharge scheme, and allowed it to persist year after year, depriving participants and dependents of lawful rights and depriving the Plan of employer contributions it should have received.

100. Defendants further breached their fiduciary duties by operating a surcharge program that was not "reasonably designed" to promote health but instead functioned as a cost-shifting mechanism. Defendants imposed surcharges on participants, while offering no reasonable alternative standard to make participants whole. Defendants also breached their fiduciary duties by repeatedly failing to provide critical information to participants regarding their rights under the Plan. Defendants acted disloyally by using these participant-funded surcharges to offset Safelite's own contribution obligations, thereby benefiting the company at the expense of Plan participants.

101. As a result of these breaches, Safelite enriched itself by retaining the amounts collected through unlawful tobacco surcharges, which increased corporate assets and reduced the employer contributions Safelite otherwise would have made to the Plan. Participants were left with increased premiums, diminished benefits, and no compliant process for avoiding or reversing the surcharges. By depriving individuals of access to a reasonable alternative standard and administering a program in which "all similarly situated individuals" could not obtain the full reward, Defendants converted what should have been employer-funded Plan contributions into savings for Safelite, contrary to ERISA § 404(a)(1)(A).

102. By withholding unlawful tobacco surcharges from participants' paychecks and using those funds to reduce its own financial obligations to the Plan, Safelite engaged in

transactions that constituted a direct or indirect transfer of Plan assets for the benefit of a party in interest—namely itself—in violation of ERISA § 406(a)(1). Safelite is a party in interest under 29 U.S.C. § 1002(14) and exercised discretionary authority over the Plan assets generated by these surcharges.

103. Defendants therefore breached their fiduciary duties by: (i) administering a surcharge program that did not conform to ERISA's nondiscrimination requirements; (ii) failing to make available a reasonable alternative standard that provided the full reward to employees or dependents; (iii) failing to disclose material information, including the existence and terms of any alternative standard and the contact information for accessing alternative standards; (iv) acting in their own interest by using participant-funded surcharges to offset employer contributions; and (v) failing to prudently review the surcharge program, Plan documents, SPD, and communications to ensure ERISA compliance. These breaches caused Plaintiff and the Class to incur unlawful surcharges and shifted substantial costs from Safelite to participants.

104. As a direct and proximate result of these fiduciary breaches, Plaintiff and Class Members lost millions of dollars in the form of unlawful surcharges deducted from their paychecks and were deprived of Plan benefits to which they were legally entitled.

105. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek all appropriate equitable relief necessary to redress Safelite's fiduciary breaches, including but not limited to restitution, surcharge, disgorgement, reformation, a constructive trust over improperly retained funds, and declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment stating that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendants to reimburse all persons who paid the unlawful and discriminatory surcharges;

D. A declaratory judgment stating that Defendants breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to adequately monitor the terms of the Plan and surcharge program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E. An Order requiring Defendants to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on it by ERISA with respect to the Plan and ordering Defendants to remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H. Restitution of all surcharge amounts Defendants collected;

I. Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of their collection of the unlawful and discriminatory tobacco surcharges;

J. Relief to the Plan from Defendants for their violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations; disgorgement of any benefits and profits Defendants received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendants to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K. An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L. An award of attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M. Any other relief the Court determines is just and proper.

Dated: January 05, 2026

Respectfully submitted,

**SIRI & GLIMSTAD LLP**

/s/ Oren Faircloth

Oren Faircloth (*pro hac vice* forthcoming)
Willian H. Payne (*pro hac vice* forthcoming)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com

CHESTNUT CAMBRONNE PA
Philip J. Krzeski (OH #0095713)
Bryan L. Bleichner
Christopher P. Renz
100 Washington Ave., Ste. 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
pkrzeski@chestnutcambronne.com
bbleichner@chestnutcambronne.com
crenz@chestnutcambronne.com

*Attorneys for Plaintiff and the Proposed Class*